**FORT WORTH HOTEL CO. et al. v.
WAGGOMAN.**

No. 13866.

Court of Civil Appeals of Texas.
Fort Worth.

Feb. 24, 1939.

Rehearing Denied March 31, 1939.

Bryan, Stone, Wade & Agerton and G. W. Parker Jr., all of Fort Worth, for appellant Fort Worth Hotel Co.

R. E. Rouer and R. B. Young, Jr., both of Fort Worth, for appellant C. Leahy.

Dayton Moses, Horace E. Moore, and Cummings & Johnson, all of Fort Worth, for appellee.

SPEER, Justice.

This suit was instituted in a District Court of Tarrant County, Texas, by B. L. Waggoman against Fort Worth Hotel Company, a corporation, W. H. Bryant, and C. Leahy (and others not involved in this appeal), for false imprisonment, seeking actual and exemplary damages.

Waggoman alleged he had been a citizen of Fort Worth for 57 years, during which time he had conducted himself as a law-abiding person, and that by his life and conduct he had established that reputation in said city, county and state. That one Bob Lentz, at the time of the matters complained of, was a house detective for the defendant Hotel Company; that on May 18th, 1937, defendant Hotel Company, acting by and through its agent and house detective, removed from the lobby of the hotel an old man named Garrett; that Lentz was employed by the Hotel Company as an officer to act for it in matters of removing persons from its premises not entitled to be there and to cause such persons to be arrested and imprisoned; that

all matters and things done by Lentz in connection with the acts complained of, were done and performed by him within the scope and apparent scope of his authority, given by the Hotel Company. That Garrett was taken into custody by Lentz in the lobby of said hotel and against his will, was caused to go with Lentz across the street to the corner of Main and Eighth Streets, and Lentz there caused officers Bryan and Leahy to imprison Garrett, without any authority of law.

It was further alleged that Waggoman (the plaintiff) saw Garrett and the officers at the point named and knowing the said Garrett to be a harmless and inoffensive old man, approached them and asked the nature of the trouble, being informed by Garrett that he did not know; Waggoman offered to make his bond; that his only purpose in making the inquiry was to aid Garrett in making bond; that all of said officers, including Lentz, then and there threatened Waggoman with arrest, and in a few moments thereafter did arrest him, with Garrett, and imprisoned him, by forcing them into a police car and taking them to the City Hall, where they were searched and all valuables taken from them.

Allegations were made that all of the acts and conduct of each of the defendants constituted a continuous transaction from the time Garrett was removed from the hotel lobby until both Waggoman and Garrett were released from custody at the City Hall.

It was further alleged that all the wrongful acts and conduct of defendants, as well as that of Lentz, were committed with wicked, malicious and unlawful intent upon the part of each of them. That because of the wrongful acts of all and each of defendants and Lentz, the plaintiff (Waggoman) has been caused to suffer great humiliation and shame; that he is of a sensitive nature and prized his good name highly, and that because of said wrongful acts he has suffered actual damages in the sum of Ten Thousand Dollars, and because of the malice alleged, has sustained exemplary damages in the same amount. He prayed for these damages.

The defendant Hotel Company answered by general demurrer, general denial, and specially, that Waggoman was legally arrested by Policeman Leahy, under a sound discretion, in that Waggoman was found under circumstances reasonably tending to show that he had been guilty of a breach of the peace and was about to commit an offense against a municipal ordinance of the City of Fort Worth, as contained in Section 1, Article 6, Title 7, of the Revised Ordinances of said City. It was further alleged that by Ordinance No. 512 of said City, all policemen may, within their sound discretion, arrest without warrant all persons found under circumstances reasonably tending to show they had been guilty of some felony or breach of the peace, or violation of some City Ordinance, or about to commit an offense against some municipal ordinance. That at the time of his arrest, the said Waggoman was violating a City Ordinance in hindering and delaying a policeman of the City of Fort Worth in making an arrest and was about to so delay and hinder said policeman.

The defendants, Bryant and Leahy (policemen) answered by general demurrers, general denial and specially denied that any of their acts in arresting Waggoman were arbitrary, malicious, unlawful or without authority; that they were assisting Lentz to remove from the Hotel Company's lobby one Garrett, claimed to be creating a nuisance there, and while they were standing on the corner of Main and Eighth Streets, Waggoman approached them and in a loud and excited manner commenced to interfere with them in their official duty, and in reality endangered the public peace and public welfare. They specially plead the provisions of Article 6 of the Revised Ordinances of the City of Fort Worth, which provides that if any person shall, by threats, menace or by gestures or otherwise, hinder or delay a City officer making an arrest, he shall be deemed guilty of a misdemeanor, providing for penalty upon conviction.

It was further alleged that from the conduct of Waggoman on the occasion in question, they believed he was about to commit a breach of the peace and that they considered it their duty to avoid such violation of the law and in pursuance of their duties as such officers, they did such things as were done, and their sense of duty prompted their said acts, and that there was no other motive back of their plain duty, as provided in the Ordinances of said City.

The issues involved were submitted to a jury and upon the verdict rendered, judg-

ment was entered in favor of Waggoman, for $1,000 as actual and $1,000 as exemplary damages against the defendants, Fort Worth Hotel Company and C. Leahy. No recovery was had against the defendants, Citizens Hotel Company or Policeman W. C. Bryant. Motion for new trial being overruled, an appeal was perfected to this court for review.

In discussing this appeal, it will be more convenient for us to refer to Fort Worth Hotel Company as appellant, and to B. L. Waggoman as appellee. When necessary to mention C. Leahy, we shall do so by name.

Appellant's first proposition, based on assignments of error shown, is to the effect that since appellee was arrested off of its property by Leahy, as a result of an argument between the two, it was not responsible for any connection Lentz (its house detective) may have had in co-operation with Leahy in making the arrest, because such acts of Lentz were not in the furtherance of its business, nor for the accomplishment of any object for which Lentz had been employed; and that anything he may have done in connection therewith was without the scope or apparent scope of his authority and the course of his employment for appellant.

The foregoing proposition goes to the very heart of this case. Insofar as the testimony is not disputed, it appears that Lentz was a house detective employed by appellant, among other things, to maintain order in the hotel lobby. Generally, he was a watchman to protect the property and the guests of the hotel; that he had been fully instructed as to his said enumerated duties; that he was to make no arrests when he had an opportunity to submit the information to city officers, and when thus submitted, the matters were to be conducted by such city officers. That, among other duties of the house detective, he was to rid the lobby of undesirable persons who were not guests but continually loafed in and about the lobby to the annoyance of the guests. That one Mr. Garrett had for a year or more loafed in the lobby and made himself a nuisance there, and constantly had annoyed the guests; that the management and Lentz had often asked him to leave the premises and cease to annoy the guests, and that he had as often failed and refused to do so; that on about May 18th, 1937, appellant Leahy, being a regular City policeman, in whose beat is located the appellant's hotel property, stopped at the hotel entrance and asked Lentz how he was getting along with loafers. Lentz replied that he had one whom he was unable to control, and Leahy said he would help to get rid of him. The two, Leahy and Lentz, went into the lobby and took Garrett into their custody and led him across the street to a police call station, and there Leahy called Police Headquarters and requested a vehicle in which to transport Garrett to the City Hall. Appellee (Waggoman) knew Garrett quite well, and upon seeing him in custody of the officers, went across the street to where they were and a conversation ensued, leading to the arrest of Waggoman. Lentz was a regularly appointed deputy sheriff and was paid by the Hotel Company.

From the time appellee arrived upon the scene, the accounts given by the witnesses differ as to the acts of Lentz. Appellee said he was crossing the street and saw Garrett in custody of the two officers and approached them and asked Garrett what was the trouble. He had known Garrett a long time and knew him to be a harmless old man. Garrett answered that he didn't know what he was arrested for. That Leahy said to Waggoman to go on down the street or he would take him (Waggoman) in. Witness said he told Leahy he had a right to ask the old man what was the trouble and that he was not trying to interfere; that Leahy put Garrett in the car and came back to the sidewalk and began talking to Lentz. The latter then pointed to him and Leahy put him in the car with Garrett and took them to the City Hall, where they were searched. Waggoman said he only wanted to make Garrett's bond; that neither he nor Lentz said a word to the other during the whole time.

Policeman Leahy testified that appellee came up to where they were making a call to headquarters and wanted to make Garrett's bond; that appellee was talking to witness and wanting to make the bond; he told appellee that was no place to make bond, that he would have to go to the City Hall to do that. That he told appellee to go on down the street. He didn't go, but continued to talk about making bond, and that after Garrett was put in the car, appellee was still talking on that line and was then put in the car and sent to the City Hall. That Lentz never said anything to the witness (Leahy) about arresting appellee; Lentz had nothing to do with the

arrest, that witness alone arrested him; that he never heard Lentz say a word to appellee, nor did he see Lentz point to appellee. Leahy said he told the driver of the police car to place a charge against appellee on the "Blotter" (at headquarters) that he was a suspicious character and a fugitive; that he told the officers driving the police car to put the charge against appellee at the instance of Lentz, of the Texas Hotel Company. The officer (Leahy) said he made the arrest without a warrant because he did not need any in such cases; that Waggoman was interfering; that he had told appellee to go on and refused to do it but kept on trying to make Garrett's bond and he arrested him. He said that Lentz was there during the whole time and that they had acted together during the time since they took Garrett out of the hotel; that they were engaged in a continuous transaction from the time they arrested Garrett until it was all over.

Lentz testified that Garrett had been loafing in the hotel lobby for a year or more; that he and the management had been trying to keep him out but could not do so; that he got Leahy to assist him to take Garrett out and across the street to where Leahy called Police Headquarters for a car; that the assistant manager of the appellant knew Garrett was going to be taken out and turned over to the police to be "put up"; that the purpose in turning Garrett over to the police was to get rid of him; that the assistant manager knew this was going to be done. Lentz said Garrett was perhaps eighty years old but that he was not harmless, but was dangerous; that Garrett's son had told him that on account of the old man's mind they would have to watch him; the witness had seen Garrett walk up to guests in the hotel lobby and without saying anything open and close his knife; that he did not tell Leahy what kind of a charge to put against Garrett. Witness did not hear anything that was said between Leahy and Waggoman; he saw them talking but did not hear what they said. He said the transaction was a continuous one from the time they took Garrett out of the hotel until both Garrett and Waggoman were put in the car.

Mrs. Mennell testified that Mr. Garrett was her father; that he was eighty years old; that she could not say positively what his mental condition was, but that his mind just drifted in a haphazard way; that he was quite forgetful; that she never knew of his doing anybody any physical harm.

Dick Harris testified in substance that he was close to the street corner when Leahy and Lentz brought Garrett from the Texas Hotel; that he saw the officers put in a call at the call-box and immediately thereafter Mr. Waggoman came across the street to where they were; that Waggoman asked Garrett what they had him arrested for and he said he didn't know; that Leahy told Waggoman to go on or he (Leahy) would take him (Waggoman). That Waggoman replied, "If that is the way you feel about it, * * *"; that those are the only remarks he heard; witness further testified that when the wagon came Leahy put Garrett in and Lentz said, "Take him too." That he saw nothing on the part of Lentz to indicate to whom he referred, except that he was looking at Waggoman when he said "Take him too." Leahy then put Waggoman in the car with Garrett and they started toward the City Hall.

■ We have given the foregoing summary of the testimony touching upon the immediate transaction involved, because it is earnestly insisted by appellant that whatever connection Lentz had with the arrest and imprisonment of appellee was not in connection with appellant's business nor its furtherance, nor for the accomplishment of any object for which Lentz had been employed, and was outside the scope or apparent scope of his employment. The contention would be correct if we viewed the transaction alone from the testimony of the manager of the corporation, in which he detailed the duties required of the house detective. For he said that the house officer was instructed not to make arrests when he had an opportunity to convey information to City officials, and that his duties in regard to police protection were confined to the hotel; but it cannot be denied that Garrett's presence in the hotel every day was objectionable to the assistant manager and that he desired Garrett's removal; much could be said on this point as to what means should have been employed by appellant to rid itself of Garrett, but we are only confronted with what was actually done; the assistant manager is shown to have known that Lentz and Leahy were going to remove Garrett from the lobby and that Lentz would deliver him to the police

department to be "put up", that is, to be imprisoned, and thus keep him out of the lobby. The assistant manager's plan of incarcerating Garrett had not been accomplished when appellee came upon the scene. The controversy that arose between appellee and Leahy was said by the latter to be an "interference" with an officer which resulted in his arrest. True, the assistant manager did not know just what difficulties Lentz would encounter in having Garrett imprisoned, but he had full knowledge that this was the ultimate object to be accomplished. The testimony of the witnesses is highly conflicting as to the real participation by Lentz in the arrest of Waggoman, but in view of the definition given by the court in his charge as to the expression "within the scope of his (Lentz') employment," and the answers of the jury in response to special issues, we cannot say there was no testimony to support them.

The court's definition and explanation of the term "within the scope of employment", will be later discussed in this opinion, since it is assigned as error. The issues submitted on the point were answered by the jury, based upon the definition given.

In response to special issues, the jury answered: (1) That Lentz was, at the time complained of, employed by the appellant; (2) That appellee was falsely imprisoned; (3) That the arrest of appellee was brought about at the direction of Lentz (appellant's house detective); (4) That at the time of appellee's arrest, Lentz was acting within the scope of his authority of employment, as that term was defined by the court.

The evidence, to which we have referred, is more than a scintilla or suspicion that Lentz brought about the arrest of Waggoman, and that he was acting within the scope of his authority in connection therewith, but, if believed, affords some evidence of a substantial nature to support the verdict. While we think it far from being conclusive, yet we are not at liberty to substitute our judgment for that of the jury. The rule in such cases seems to be well settled that if, discarding all adverse evidence and giving full credit to all evidence that is favorable to the successful party and indulging every legitimate conclusion that is favorable to him, a jury might have found in his favor, then it is to be concluded that there is evidence to support the verdict. 17 Tex.

Jur., p. 909, sect. 410; McCarty v. Hogan, Tex.Civ.App., 121 S.W.2d 499, writ dismissed; Wininger v. Ft. Worth & D. C. R. Co., 105 Tex. 56, 143 S.W. 1150, and many other cases could be cited to the same effect. The proposition and assignments of error raising this point must be overruled.

Appellant's fifth proposition is based on its 13th and 14th assignments of error. They challenge the correctness of the court's definition of the term "within the scope of his employment," as used in the charge. The definition given by the court is in these words: "By the term, within the scope of his employment, when used relative to the acts of an agent or employee, is meant, acts done by an agent or employee while such agent or employee is engaged in the service of his employer, or while about his employers' business, in which he was employed to assist." The definition as given was timely objected to by appellant, and the court was requested to give in lieu of the one just quoted, the following definition or explanation: "By the term 'within the scope of his employment' when used relative to the act of an agent or employee, means an act done by an agent or employee under general authority given to said agent or employee by his employer, and that such act is done in furtherance of the employer's business and for the accomplishment of the purpose for which the employee is employed." The objection of appellant was overruled and the requested definition was refused by the court. In this we think there is reversible error.

It is indisputably true that whether or not appellant is responsible in damages in this case depends upon a determination of whether Lentz, appellant's agent and employee, was acting within the scope of his authority when he did the things shown by the evidence above referred to. It therefore becomes vitally important that the jury should have been properly instructed as to what was meant by the expression, "acts within the scope of his authority."

By a comparison of the explanation given by the court and the one requested by the appellant, it will readily be seen that the former is too general and permits much more latitude to the jury than the latter. Under the court's definition, it covers acts of the agent while engaged in the service of the master or while about his master's business, in which he was employed to assist. While by the

terms of the requested instruction, the expression would mean, such acts of the agent as were done under general authority given by the master when such act is done in furtherance of the master's business and *for the accomplishment of the purposes for which the servant was employed.*

This principle was discussed at length by our Supreme Court in the early case of International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S.W. 1039, 27 Am.St.Rep. 902. In that case a brakeman, in his effort to rid his employers' train of a trespasser, knocked him off of a moving car; the trespasser fell under the train and was injured. The question arose whether or not the brakeman was acting within the scope of his authority when he committed the act. At page 1040, of 17 S.W., the court, speaking through Judge Gaines, said: "It follows that, unless we can say that a brakeman has an implied authority to eject trespassers from the train upon which he is employed, the charge was error for which the judgment must be reversed. To hold the master liable for the acts of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary of his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. *It must be done in the furtherance of the master's business, and for the accomplishment of the object for which the servant is employed.*" (Italics ours). The requested definition which was refused by the court is in almost the identical language used by the Supreme Court, from which we have quoted. That case has been many times followed and is the settled law on the subject. See International & G. N. R. Co. v. Cooper, 88 Tex. 607, 32 S.W. 517; Burnett v. Oechsner, 92 Tex. 588, 50 S.W. 562, 71 Am.St.Rep. 880; Texas P. & L. Co. v. Denson, 125 Tex. 383, 81 S.W.2d 36. The error committed in refusing the requested charge requires a reversal of the judgment rendered.

Appellant's second proposition is to the effect that the court erred in permitting appellee to introduce evidence from several citizens of Fort Worth to the effect that appellee bore a good reputation for honesty, fair dealings and that his reputation for truth and veracity was likewise good. It is claimed that appellee's reputation in these respects had not been attacked and no grounds for the admission of such testimony existed.

■■ The general rule of law in this State on this point seems to be that a person may not offer evidence of his good character until it has been attacked, either by evidence or by the pleadings of the opposing party, or unless the very nature of the suit is such as makes it an issue. The rule is based upon the theory that every man's character is good until it is called in question. Appellee had plead as a part of his cause of action that because of the wrongful acts of the appellants, and each of them, he had been caused to suffer great humiliation and shame; that he was of a sensitive nature and highly prized the good name he had borne among his acquaintances. Under their general denials, the appellants denied all of those allegations and demanded that they be proven; if testimony had been available, appellants could have shown under their answer that appellee's character was not what he claimed it to be; by their answer they put him upon proof of his allegations and now object to the evidence. We think the nature of the suit is such that appellee's character was at issue.

■ The evidence of appellee's character was admissible for another reason; that is, upon the measure of appellee's damages, or to aid the jury in arriving at the extent to which he had suffered, if at all. It would be idle to say that a person whose general reputation for honesty was bad, would suffer the same injury to his feelings for having been illegally arrested, as one whose character and reputation were above reproach. It will also be observed that appellee offered this testimony before he rested his case. When the testimony was offered, he could not know the defendant would not attempt to follow up its pleadings filed in defense of his claims.

In 22 C.J., p. 472, sec. 563, it is said: "Character may be a relevant fact apart from any inference as to conduct arising therefrom, and where this is the case, evidence of the character of the person in question is admissible. So, where the damages claimed embrace injuries to feelings, as in actions involving chastity, malicious prosecution, false imprisonment, or libel or slander, it may be shown that plaintiff's character is such that less than a normal injury in this particular could be inflicted by the acts of defendant."

In Houston Chronicle Pub. Co. v. Tiernan, Tex.Civ.App., 171 S.W. 542, it was held, in an action for libel, the plaintiff could prove his good reputation when the publication complained of is an attack on his character, or such attack is made in defendant's pleadings, or the nature of the action involves his character.

Waggoman v. Fort Worth Well Machinery Co., 124 Tex. 325, 76 S.W.2d 1005, was a case for false imprisonment, in which the Machinery Company above named filed a cross action in which it sought judgment for sums of money alleged to have been embezzled by the plaintiff during the period of his employment. Waggoman proved by a number of persons that his general reputation for honesty and fair dealings and for truth and veracity was good. Defendant presented the admission of that evidence as error, and the court, at page 1006, said: "The question of law involved here is correctly stated in Grant v. Pendley (Tex.Com.App.) 39 S.W.(2d) 596, 599, 78 A.L.R. 638. There it was said: 'We therefore announce the rule to be that supporting evidence of good character, either for truth and veracity or honesty and fair dealing, should only be admitted in those cases where the nature of the action directly involves the character of a party, where a witness has been impeached, or where a party by his pleading or evidence charges his adversary with the commission of a crime involving moral turpitude.' "

The authorities in this State are not very explicit on the point involved here. In Grant v. Pendley, supra, above mentioned, Judge Leddy of the Commission discussed many text writers and decisions from other jurisdictions, in a case where an action involved the cancellation of a deed for fraud. In that case it was held that the type of fraud shown by the pleadings did not authorize the introduction of evidence of the good character of the party charged. Summing all up, he announced the general principle quoted and as shown, it was followed and approved by the Supreme Court speaking through Judge Pierson. That case is cited and relied upon by appellant here in support of its objection to the introduction of the testimony.

The general rule announced above by us, it seems, is not an inflexible one. In Schaff v. Beale, Tex.Civ.App., 250 S.W. 757, writ dismissed, it was held that in a case by a negro woman for damages because of injuries sustained while a passenger on a railroad train, that under a defendant's general denial it could have proven that plaintiff was malingering, and in fact questions asked and the answers excluded, indicated that defendant was endeavoring to make it appear plaintiff was of a type that believed herself entitled to teach in schools of mixed white and colored children, and she was permitted to prove her own good character in keeping with that of her race. In reviewing the authorities on the point, the court said, at page 758: "And investigation of those cases [on the admission of evidence as to character] will show that there is no inflexible rule of law regarding the admission of this character of testimony." The Grant v. Pendley case, supra, however, is subsequent to the case last cited, and we believe the pronouncement there quoted and adopted by the Supreme Court in Waggoman v. Machinery Co., supra, settles the question against the contention of appellant.

Appellant's third and fourth propositions complain of the introduction in evidence of the Police Blotter, showing the charges made there against appellee and the statements made by and to appellee at the Police Station when he was taken there after his arrest.

The charge shown by the Police Blotter was that which Leahy instructed the officers who drove appellee to the City Hall to have put on the books and the course of questions asked by the police department and the answers given by appellee were the routine matters required in such cases, and must have been fully anticipated by Leahy when he sent appellee there. Leahy was a defendant with appellant in an action for an alleged tort, and the evidence was clearly admissible, especially as against him.

The objection urged by appellant (Hotel Company) to the introduction of the "Blotter" and its entries was that it was hearsay, that no showing was made as to who made the entries or where the information came from and was not binding on it.

There was no request made by appellant (Hotel Company) to have the testimony limited in its effect to such manner as it might affect its co-defendant, Leahy, nor was the objection as made such as could be construed to mean that this was its desire. The rule is well settled that in actions against joint tort feasors,

that testimony which is admissible against one cannot be excluded upon the objection of another, as urged here, but the only relief available to the one complaining is to have it limited to the one against whom it is admissible. Armour & Co. v. Tomlin, Tex.Civ.App., 42 S.W.2d 634, affirmed by Supreme Court in 60 S.W.2d 204, and cases there cited; 3 Tex.Jur., p. 192-3, sect. 129; Sproles Motor Freight Lines v. Juge, Tex.Civ.App., 123 S.W.2d 919. The assignments are overruled.

Appellant's sixth and seventh propositions, based on proper assignments of error, are to the effect, (a) that since the testimony of Leahy shows he made the arrest of his own volition, there was no testimony tending to connect Lentz with such arrest, and (b) in the absence of any testimony showing Lentz participated in the arrest, the court should not have submitted such an issue to the jury. These assignments are overruled for the reasons shown in the discussion of the first proposition above.

The eighth proposition asserts that the record in this case shows no grounds upon which appellee could or should have been awarded exemplary damages. This proposition is sustained.

We have carefully read the evidence adduced relating to this whole transaction and viewing it as we do, we can find no rule of law which will entitle appellee to recover exemplary damages in this case. The only approach to such damages that we have been able to find is the fact that the assistant manager of appellant knew Lentz was going to take Garrett out of the hotel and deliver him to the police to be "put up" or we may say, locked up. It doesn't appear that the assistant manager had any idea that Garrett had committed such an offense that he could not make bond and be released promptly; nor does it appear that he could have reasonably anticipated that in doing the thing he knew Lentz was going to do would cause him to willfully and maliciously do some other person a wrong. No effort was made to show that the appellant ratified any such acts, after they were done, if they really transpired. The rule in such cases is thoroughly discussed by our Supreme Court in Fort Worth Elevator Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397, where this rule was announced, 123 Tex. page 148, 70 S.W.2d page 408: "The rule de-

ducible, it seems to us, from the Texas authorities, is that exemplary damages are not recoverable against a corporation where the grossly negligent act involves only a breach of duty by a mere servant or employee as such, unless the act was previously authorized or was subsequently approved by the corporation."

The ninth proposition is based on assignments of error Nos. 24 and 25, and complain of improper argument of appellee's counsel; we sustain these assignments. There was testimony that appellee had recently lost his wife, and this evidence, to which no objection was made, seems to be the basis for the argument to which this proposition refers. The bill of exception shows counsel, in his closing argument, used this language: "Sometimes I have wondered—and the evidence in this case forces me to mention it, because Mr. Waggoman testified that it was only about two weeks ago that he put his wife away, but I have often wondered whether or not it could be possible, since we have the radio and all of our knowledge of electricity, somehow the idea has occurred to me that maybe when they pass beyond, that there may be some means of communication by which they may still be interested in knowing what goes on down here, so that with that in mind, I would like to know when these questions are answered, that it can be known up there. I can see her now, with her face pressed against the window pane of heaven, waiting to hear the result of this, that caused this man all of the humiliation and shame that it is possible for a human soul to endure, during the days and weeks of suffering that preceded the going of that individual, and if there be an electrical current that would carry the message, I would like to whisper out into the atmosphere the thought that the jury had said that Ben L. Waggoman did not interfere with an officer, that he was falsely imprisoned by these defendants, and that as a result of that humiliation and shame has been assessed damages by a jury of a substantial value."

The rule in this State is well established that if argument of counsel is of a highly inflammatory nature and calculated to arouse the prejudices of the jury and there is any reasonable doubt of the harmful effect of such argument, it becomes the duty of the appellate court to re-

verse the judgment rendered. Hudson Ins. Co. v. McKnight, Tex.Civ.App., 58 S.W. 2d 1088.

In Robbins v. Wynne, Tex.Com.App., 44 S.W.2d 946, it was held that where counsel, in his argument, goes outside the record and gives the jury information not properly before them, which is calculated to injure opposing party, reversible error is presented unless it affirmatively appears that no injury resulted therefrom.

Traders & General Ins. Co. v. Ross, Tex.Com.App., 117 S.W.2d 423, is a case in which a reversal was ordered for argument much less prejudicial, we think, than that here complained of. The test applied by the court in that case was that if the argument made was outside the record and of such harmful nature that it cannot be said beyond a reasonable doubt not to have caused injury, reversible error is presented. To the same effect are the cases of Bell v. Blackwell, Tex.Com.App., 283 S.W. 765; McCrearry v. St. Louis S. W. R. Co., Tex.Com.App., 1 S.W.2d 868.

We reviewed the authorities and expressed our views upon the effect questionable argument would have upon a final judgment rendered, in case of Traders & General Ins. Co. v. Crouch, Tex. Civ.App., 113 S.W.2d 650, at page 655, writ of error being denied in that case. What was there said is applicable here. We still recognize the rule under our procedure that an attorney is allowed great latitude in discussing his case before the jury, but, after all, he must confine his argument to the issues involved. No objection can be successfully urged against an argument solely because of its oratorical appeal, forensic eloquence or metaphorical analogies, so long as they are applicable to facts and issues involved. We again cite the authorities referred to in that opinion. We think the holding in case of Rio Grande etc. Ry. Co. v. Dupree, Tex.Com.App., 55 S.W.2d 522, relied upon by appellee, goes no farther than the rule announced by us. The argument complained of in this case was clearly calculated to appeal to the sympathies and tender affections in the bosoms of good men who are called upon to perform jury service. There is nothing in the record to indicate it did not have that effect. The rule in such cases, as announced in 41 Tex. Jur., p. 816, sect. 85, is: "The burden is upon the appellee to show that no prejudice resulted from the improper argument, and it is no longer the rule that to authorize a reversal there must be a finding of prejudice. On the contrary, the presumption is that improper argument influenced the verdict." The assignment of error complaining of that part of the argument of counsel quoted must be sustained.

Other assignments challenge other arguments made by appellee's counsel, but to our mind they are not as objectionable as that above referred to, yet it is very probable none of them will again occur upon another trial, and we pretermit a discussion of them.

For the errors pointed out, the judgment of the trial court is reversed and the cause remanded for another trial.

### On Rehearing.

Appellants, Fort Worth Hotel Company and C. Leahy, have filed their respective motions for rehearing, in which they insist that we should set aside our order remanding this cause, and render judgment in their favor. This we are not inclined to do. But our attention has been called to matters involved in the appeal which we believe should be clarified, in view of another trial.

In discussing appellants' second proposition, in which it was complained that the trial court permitted, over objections of appellants, several citizens to testify as to appellee's good reputation for honesty and fair dealings, as well also for truthfulness, we treated the two lines of testimony together, as did the cases cited by us. We still think it was entirely proper in a case of this character to admit testimony as to appellee's good character. The pleadings, the nature of the wrongs complained of and the amount of damages sustained, made this an issue. If the pleadings upon another trial should be the same, and if the issue of his general reputation as to being a law-abiding citizen and one of good character for honesty and fair dealing is not confessed by defendants below, the court should hear evidence, if tendered in support of it.

We do not believe the same rule should be applied concerning evidence for appellee's truthfulness. Insofar as applicable to this phase of the testimony, what we have said in the original opinion is withdrawn. The nature of the case, as made, did not involve appellee's general reputation for truth and veracity to any greater extent than in any other law suit,

where a party testifies in his own behalf. In such circumstances we can see no reason, under our procedure, to permit a party-witness to bolster his own testimony by proving that his reputation in the community for truthfulness is good. We think a correct rule, in this respect, was announced in Jenkins et al. v. Pure Oil Company, Tex.Civ.App., 53 S.W.2d 497, where, at page 500, it is said: "Testimony offered to sustain the good character of a witness for truth and veracity is not admissible unless an attempt has been made by the opposite side to impeach such character. Every witness is presumed to be truthful until the contrary is shown, and the contradiction of a witness by other witnesses testifying differently is not such an attack upon the character for truth and veracity as authorizes the introduction of testimony sustaining the general character for truth and veracity."

We also think, as was expressed in another part of the opinion from which we have last quoted, that the bolstering of appellee's general reputation for truthfulness gave him an undue advantage over appellants and was calculated to confuse the jury and cause them to pass upon a collateral issue, rather than the one properly before the court. In Grant v. Pendley, Tex.Com.App., 39 S.W.2d 596, 78 A.L.R. 638, discussing the effect of injecting collateral issues into a trial, the court said, at page 599: "With both sides using character witnesses, often the real merits of the controversy would be obscured or entirely lost sight of, and he who could best develop this phase of his testimony would stand the better chance to obtain a verdict. As has often been declared, it is a far safer rule that controversies between citizens should be decided upon facts having a direct bearing upon the issues between them rather than upon mere opinions of partisan friends as to the relative standing of the parties to the litigation." See also 45 Tex.Jur., p. 140, sects. 268 and 269; Ibid. p. 271, sect. 339. Under the same conditions existing upon the former trial, we think the class of testimony discussed should not be admitted.

Appellants' motions challenge our expression used in the former opinion, where we stated that "the assistant manager (of the Hotel Company) knew Lentz was going to take Garrett out of the hotel and deliver him to the police, to be 'put up.'" They say they do not think such an inference can be drawn from the record, and quote at length from the testimony, in support of their contention. Our statement was based upon a summary of testimony, some of which is quoted by counsel, to the effect that the assistant manager knew Lentz and Leahy were going to take Garrett out of the hotel, and Lentz, in that connection, further testified: Question: "You took him over there for the purpose of—under the advice of the assistant manager, to turn him over to Mr. Leahy to go and put him up, did you not?" Answer: "Yes." We do not think our expression could even be classed as an inference, nor do we think we did any violence to the evidence by the manner in which we referred to it.

Complaint is also made in these motions of our holding in connection with the introduction in evidence, over their objections, of the police "blotter" and what was said at Police Headquarters. We held that the procedure at Headquarters was admissible against Leahy, and because of the lack of proper objections upon the part of the Hotel Company, no error was shown to the consideration of that evidence as against it. They say in their motions that, "Leahy did not tell any one that the charges were made at the instance of Lentz or the Hotel." We think the record supports the construction given by us. Leahy testified: Question: "Didn't you notify those officers there to put this charge (the one appearing on the Blotter) against Ben Waggoman, at the instance of Lentz of the Texas Hotel?" Answer: "Yes." Question: "You told them that, didn't you?" Answer: "I told them right there when I brought him in." In such circumstances we think, as stated in the original opinion, that Leahy could and did anticipate that the entries would be made at Headquarters in line with his instructions to the driver of the Squad car which was called to take Garrett and Waggoman to the Police Station, and that he is chargeable with notice of the procedure that would be followed when his instructions were carried out.

From the way we view the whole case, we believe we have properly disposed of this appeal, and with the correction herein made, as to the introduction of evidence supporting appellee's reputation for truthfulness, under the conditions existing at the time of the other trial, the motions for rehearing are overruled.