OPINION

No. 04-05-00565-CV

LIVING CENTERS OF TEXAS, INC., 

Cyndi Brown, LNFA; and Kimberly Bordovsky, DON,

Appellants

v.


Augustine PEÑALVER, Individually and As Independent Executor of the Estate of Maria Belia Peñalver, Deceased; and
Ramon Peñalver,

Appellees
From Probate Court No. 2, Bexar County, Texas

Trial Court No. 2001-PC-0706

Honorable Tom Rickhoff, Judge Presiding



Opinion by: Phylis J. Speedlin, Justice

Dissenting opinion by: Sarah B. Duncan, Justice

 

Sitting: Sarah B. Duncan, Justice

 Phylis J. Speedlin, Justice

 Rebecca Simmons, Justice



Delivered and Filed: September 13, 2006



AFFIRMED

 This is an appeal from a judgment rendered on a jury verdict awarding survival and wrongful death damages to the estate of
Maria Belia Peñalver and to her two sons, Augustine and Ramon Peñalver. Appellants' complaints fall into two categories: 
(1) jury argument; and (2) sufficiency of the evidence supporting the damage awards. We affirm. 

Background

 The underlying wrongful death and survival lawsuit was filed by the Independent Executor of Maria Belia Peñalver's estate
and Peñalver's two sons, Augustine and Ramon (collectively, "the plaintiffs"). The case has been tried twice and is on its
second appeal. The evidence, considered favorably to the verdict, shows that Mrs. Peñalver was admitted to Silver Creek
Manor nursing home in 1997 because she needed twenty-four hour care and the family could no longer care for her. In
September 2000, Christina Bartek, a certified nurse's aide, attempted, without assistance, to transfer Mrs. Peñalver from her
wheelchair to her bed and dropped her. Mrs. Peñalver suffered injuries including a laceration to her earlobe, abrasions and
contusions to the left side of her body, a subdural hematoma, and an intracerebral hemorrhage or bleeding in the brain. She
died the next day. The medical examiner ruled the death accidental, caused by trauma from the fall. 

 Augustine and Ramon filed a wrongful death and survival suit against three defendants, Living Centers of Texas, Inc. d/b/a
Silver Creek Nursing Home; Silver Creek's administrator, Cyndi Brown; and Silver Creek's director of nursing, Kim
Bordovsky (collectively, "Living Centers" or "defendants"). The initial jury trial resulted in a verdict in favor of the
plaintiffs on their negligence claim, apportioning 50% of the fault to Living Centers, 25% to Brown, and 25% to
Bordovsky. All parties appealed the judgment and this court reversed and remanded for a new trial. See Peñalver v. Living
Centers of Texas, Inc., No. 04-02-00920-CV, 2004 WL 1392268 at *1, *5 (Tex. App.--San Antonio June 23, 2004, no pet.).

 Before the second trial on remand, Living Centers, Brown, and Bordovsky stipulated "to their joint and several liability for
negligence proximately causing the death of Maria Belia Peñalver" and the case went to trial on the amount of
compensatory damages. The trial court signed a judgment in accordance with the verdict (1)

, awarding the estate $510,000 and Augustine and Ramon each $300,000. In this appeal, Living Centers contends the
plaintiffs' attorney made an improper and incurable jury argument that requires reversal; the damage awards are not
supported by legally or factually sufficient evidence; and without regard to the sufficiency of the evidence, the damage
awards are so excessive they clearly resulted from passion and prejudice. The plaintiffs have cross-appealed, contending
the appeal is frivolous.

Jury Argument

 Living Centers asserts the trial court abused its discretion in denying defendants' motion for new trial on the ground that
plaintiffs' counsel made an improper and incurable jury argument. The challenged closing argument referenced the T-4
Project of World War II as follows:

 . . . But for some reason the defense is that this death is not significant because she is old and because she is impaired. 

 

 I disagree. Our society has not regressed to the point that we tolerate a wrongful death of anybody, of any age, or of any
infirmity. 







 A factor in World War II - you heard me ask about - I asked Dr. Bauserman about the T-Four Project. (2) In World War II
the Germans had a project called T-Four. You probably heard about it in history books. 

 

 But what they did is they took all the people who they thought were inferior in society, primarily older people, impaired
people, and they used them for experiments. They killed them. Over 400,000. That culture 60 years ago didn't consider the
impaired and elderly valuable. 

 

 Our culture has never looked at that. We went to war to stop that, the biggest war in the history of the world to stop those
atrocities that were going on. And we're not at the point where we're tolerant today, as the defense would like you to be, of
this wrongful death. 

 

 The most significant gift we have from God is life itself. So shouldn't the damages for the loss of that significant life also
be significant? The defense says our society says no. I think you folks disagree. 

 . . . 



 It's the defense lawyers' job - and you've got - seen very fine lawyering by the defense lawyers. Fulbright and Jaworski, an
excellent law firm, excellent lawyers. I respect their ability. 



 But their job here is to convince you that the damages are insignificant to minimize the damages. How have they done
that? At the very beginning in opening statement [they] said they only have two defenses, if you want to call it defense. 
She is old and she is impaired. 



 That is not a defense to a wrongful death. Just like in the criminal justice system, if you murder someone, the fact they are
young or old doesn't make a difference. It's a human being loved by God, loved by family, and protected by the laws of our
society. Belia was protected by the laws of our society. And her death does make a significant difference to this family,
and it should to our entire community. 

 . . . 

 

 So it really goes back to that, the initial issue, where are we as a society? Have we regressed to 1944, 1945 Germany? 
Have we regressed or gone ahead so far now, 60 years later now, we have a different attitude, that a wrongful death of an
elderly or impaired person is not every bit as significant and has every bit as significant damages as the wrongful death of
anyone else? 



 Living Centers maintains that the above-quoted argument compares "defendants, their treatments, and defense to the Nazi
Germany's deplorable T-4 Euthanasia Program wherein the elderly and the infirm were calculatedly and brutally murdered." 
As such, Living Centers contends the argument is both an impermissible appeal to ethnic unity and an attack on the integrity
of defense counsel. Living Centers asserts that because the argument is "extremely inflammatory and intentionally crafted
by Plaintiffs' counsel to play on the jury's prejudices," it is incurable and necessarily harmful, requiring reversal of the trial
court's judgment. 

 The plaintiffs defend the argument by characterizing it as a reference to history in response to Living Centers' "defense,
throughout the trial, that Mrs. Peñalver was old and impaired, had no quality of life and no significant life expectancy and,
therefore, fair and adequate compensation equated to an insignificant amount." The plaintiffs further maintain that Living
Centers has "exaggerated" the argument; that plaintiffs' counsel never compared the defendants or their attorneys to Nazis;
and that the words "Hitler," "Nazi," "brutally murdered" and "calculated murder" were never used by plaintiffs' counsel in
closing argument. Finally, plaintiffs assert that, even if improper, the argument was curable, and Living Centers waived
error by failing to object. 

 Trial counsel must confine their argument "strictly to the evidence and to the arguments of opposing counsel." Tex. R. Civ.
P. 269(e). However, this does not mean that jury arguments must be sterile or nondescript; instead, counsel has great
latitude in discussing the facts and issues. Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054, 1055 (1940); Sanchez v.
Espinoza, 60 S.W.3d 392, 395 (Tex. App.--Amarillo 2001, pet. denied). For instance, counsel may discuss the
"environments" or circumstances of the case, the reasonableness or unreasonableness of the evidence, and the probative
effect (or lack thereof) of the evidence. Ramirez, 138 S.W.2d at 1055. Counsel's comments must be analyzed in light of the
entire argument to determine their propriety. Sanchez, 60 S.W.3d at 396. 

 Generally, to obtain reversal on the basis of improper jury argument, an appellant must prove "(1) an error (2) that was not
invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a
motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the
judge." Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839 (Tex. 1979). Further, unless the argument is of the incurable
type, the appellant must also prove "that the argument by its nature, degree and extent constituted reversibly harmful error,"
and "that the probability that the improper argument caused harm is greater than the probability that the verdict was
grounded on the proper proceedings and evidence." Id. at 839-40. The length of the argument, whether it was repeated or
abandoned, and whether there was cumulative error are proper inquiries in this determination. Id. The appellate court must
closely examine all of the evidence to determine the argument's probable effect on a material finding. Id.at 840. Finally,
the appellate court must evaluate the jury argument in light of the entire case, beginning with voir dire and ending with
closing argument. Id. 

 Here, because liability was stipulated during the second trial on remand, both plaintiffs and defendants focused solely on
the issue of damages; a difficult issue as Mrs. Peñalver was already ninety years old at the time of her death. As defense
counsel explained in closing, the jury had to determine "the value of the love, comfort and companionship that [Augustine
and Ramon] would have gained from [Mrs. Peñalver] had she lived[.] So, of course, we have to consider how long she
would have lived." Although our review of the entire record reveals no evidence that the staff of Silver Creek Nursing
Home or defense counsel did not value human life, the defense clearly focused throughout trial on Mrs. Peñalver's age and
her progressively deteriorating health, suggesting that her full and happy life was behind her. Thus, it is not surprising that
plaintiffs responded on the issue of how to value a ninety-year-old-woman's remaining life before her negligently-caused
death, and how to value the benefit her family would have derived from her continued presence in their lives and the loss of
that presence. Nevertheless, the "'great latitude' permitted counsel of both parties to indulge in 'flights of oratory' has its
limits...." Southwestern Greyhound Lines, Inc. v. Dickson, 149 Tex. 599, 236 S.W.2d 115, 119 (1951). For the purpose of
this opinion, we assume without deciding that plaintiffs' counsel improperly exceeded the limit of tolerable jury argument. 

 However, it is undisputed that Living Centers did not object or ask for a curative instruction. Indeed, Living Centers had
the opportunity to raise an objection outside the presence of the jury because the court took a brief recess shortly after the
challenged argument. Living Centers chose not to raise an objection or request an instruction during trial, but waited to
complain of the jury argument in its motion for new trial. See Texas Emp. Ins. Ass'n v. Haywood, 153 Tex. 242, 266
S.W.2d 856, 858 (1954) ("... ordinarily a litigant will not be permitted to lie in wait, taking a chance on a favorable verdict
and, being disappointed, complain of improper argument for the first time in a motion for new trial"). A complaint about
improper, but curable, jury argument is waived by the failure to object at trial. Standard Fire Ins., 584 S.W.2d at 841. 
Thus, the issue becomes whether Living Centers can sustain its burden to prove that plaintiffs' argument was incurable. See
Otis Elevator Co. v. Wood, 436 S.W.2d 324, 333 (Tex. 1968) (holding that if an "argument [is] so inflammatory that its
harmfulness could not be eliminated by an instruction to the jury to disregard it," and "[t]he prejudicial nature of the
argument is so acute that is 'incurable,'" then "the failure to object does not result in a waiver"). 

 "There are only rare instances of incurable harm from improper argument." Standard Fire Ins., 584 S.W.2d at 839. The
test for incurable error in jury argument is whether the argument, when viewed in light of the entire record, was so
inflammatory as to strike at the heart of the adversarial process or appeal to fundamental prejudices. Macias v. Ramos, 917
S.W.2d 371, 375 (Tex. App.--San Antonio 1996, no writ). While we agree that "[t]he injection of new and inflammatory
matters into the case through argument has in exceptional instances been regarded as incurable by an instruction," we
disagree that this is such an "exceptional" case. Standard Fire Ins., 584 S.W.2d at 840. Plaintiffs' counsel did not appeal to
a racial or ethnic prejudice held by the jury, or attack defense counsel's integrity. See Amelia's Auto., Inc. v. Rodriguez, 921
S.W.2d 767, 773 (Tex. App.--San Antonio 1996, no writ) (argument's attack on integrity of opposing counsel was incurable
error); Texas Employers' Ins. Ass'n v. Guerrero, 800 S.W.2d 859, 866 (Tex. App.--San Antonio 1990, writ denied)
(argument's appeal to jury's prejudice against party's ethnicity was incurable error).

 The dissent would say any reference to Hitler no matter how attenuated goes too far and constitutes incurable error and
obviates the need for a proper objection. We disagree. Not every reference to an emotionally-charged time in history, even
one as horrific as the T-4 Project, results in incurable error. Analogy is a tool that can be used during closing argument. 
See Lone Star Ford,Inc. v. Carter, 848 S.W.2d 850, 853 (Tex. App.--Houston [14th Dist.] 1993, no writ); see also Fort
Worth Hotel Co. v. Waggoman, 126 S.W.2d 578, 587 (Tex. Civ. App.--Fort Worth 1939, writ dism'd) ("No objection can be
successfully urged against an argument solely because of its oratorical appeal, forensic eloquence or metaphorical analogies,
so long as they are applicable to facts and issues involved"). Also, in argument the facts of the case may be related to
history, fiction, personal experience, anecdotes, Bible stories, or jokes. See, e.g., Louisiana & Ark. Ry. Co. v. Mullins, 326
S.W.2d 263, 267-68 (Tex. Civ. App.--Texarkana 1959, writ ref'd n.r.e.); Sheffield v. Lewis, 287 S.W.2d 531, 539 (Tex. Civ.
App.--Texarkana 1956, no writ); Winnsboro Cotton Oil Co. v. Carson, 185 S.W. 1002, 1008 (Tex. Civ. App.--Dallas 1916,
no writ); Beaumont Traction Co. v. Dilworth, 94 S.W. 352, 355 (Tex. Civ. App.--1906, no writ). 

 While we do not condone comparisons to Hitler, Nazis, or the programs adopted by the Nazis to eradicate whole segments
of society, we believe it is significant that the issue before the jury was one of damages, not liability. Plaintiffs' counsel did
not suggest that "the jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity." See
Texas Employers' Ins., 800 S.W.2d at 866. Plaintiffs' counsel did not compare defense counsel or any one of the defendants
personally to the Nazis. Counsel did not compare the care offered by the nursing home to Nazi programs. Instead, we
conclude that, when read in context, it is clear that plaintiffs' argument referenced an event during World War II in order to
demonstrate that the life and death of an elderly and impaired person is considered significant in our society. Counsel
clearly stated to the jury members, "That culture 60 years ago didn't consider the impaired and elderly valuable. Our
culture has never looked at that. We went to war to stop that, the biggest war in the history of the world to stop those
atrocities that were going on." 

 Moreover, contrary to Living Center's argument that plaintiffs' counsel compared the defendants and defense counsel to
Nazis, no such explicit comparison was ever made by plaintiffs' counsel. Instead, Living Centers is the party which, in its
own closing argument, explicitly referred to "Nazis" four times, in an apparent attempt to counter the plaintiffs' argument:

 . . . In 25 years of practicing law, I have never heard such a claim. I came before you at the very beginning of this case
telling you that it was going to be an emotional issue. And, obviously, after what you just heard, that's correct. 



 But there are no Nazis in this courtroom, and there are no babies. And there is an old, old rule of law that says, when the
law is against you, practice character assassination. And I've never been accused of being a Nazi before, but that's not what
this case is about. 

 . . . 



 See, when you come down to your verdict, you don't get to think about things like Nazis, and babies, and the other lawyers,
and whether they are good or bad, or anything like that. 

 

 You have to think about the facts of the case. And so I started out by telling you what I want to tell you now. We are here
because obviously the parties have substantial disagreement about what fair and reasonable compensation is. 



 But, obviously, the question is not the value of a life. Because the life in this case has been lived. It looks a lot like the
first five minutes of Mr. Mauze's closing argument. It looks a lot like Plaintiffs' Exhibit 5. It sounds a lot like the legacy
that both of these fine gentlemen talked to you about. 



 And that's good, and that's wonderful, and that's right, and it's lived and it's done, and they have got it, and they had it, and
they knew it. And they also knew, ladies and gentlemen, that it was coming to an end. And so as hard as it is for all of us
to deal with, we have to look at the facts. 

 . . . 



 . . . And they would rather talk about Nazis and babies so that you don't get to the facts of the case. And so, ladies and
gentlemen we brought you what we had to bring to you. . . . 



 Not only did Living Centers not object to the plaintiffs' argument at trial, its own actions exacerbated any error. Living
Centers took the plaintiffs' single reference to a relatively unknown event in history, i.e., the T-4 experiments, and expanded
it with multiple references to the universally known term "Nazi." Living Centers further transformed an indirect reference
to a time period in history into an explicit reference to a racist group or view.

 Viewed in the context of the entire record, we do not believe plaintiffs' closing argument, which referenced Germany's T-4
Project during World War II, constituted incurable error. Furthermore, Living Centers had the opportunity to object and
request a curative instruction outside the jury's presence and failed to do so. See Standard Fire Ins., 584 S.W.2d at 841; c.f.,
Otis Elevator, 436 S.W.2d at 333 (counsel not required to object in front of jury if doing so risks prejudicing one's cause
with the jury); General Motors Corp. v. Iracheta, 161 S.W.3d 462, 472 (Tex. 2005) (counsel not required to object in front
of jury where to do so would risk the jury's ire). Instead, Living Centers worsened any prejudice flowing from the argument
by its own closing comments. See Haywood, 266 S.W.2d at 858. Accordingly, Living Centers' complaints regarding
plaintiffs' jury argument are overruled.

Damages

 Living Centers next asserts the damage awards are excessive and the result of prejudice and passion, thus entitling Living
Centers to a new trial or, alternatively, a remittitur. Living Centers bases its contention that the damages are excessive on
its argument that the jury's deliberations were brief (3) and plaintiffs' closing argument "invoked the jury's passion and
prejudice to reach an award in favor of Plaintiffs to the extent that [the] incurable argument rendered the jury incapable of,
or entirely unwilling, to consider the case on the merits." Living Centers also argues that the evidence is legally and
factually insufficient to support the damage awards.

 Standard of Review

 In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting
favorable evidence that a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder
could not. City of Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005). Evidence is legally insufficient when there is a
complete absence of evidence of a vital fact; the trial court is barred by rules of law or evidence from giving weight to the
only evidence offered to prove a vital fact; the evidence offered to prove that fact is no more than a mere scintilla; or the
evidence conclusively establishes the opposite. See Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997). In reviewing the factual sufficiency of the evidence, we consider, weigh, and examine all the evidence presented at
trial, including any evidence contrary to the judgment. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989).
We set aside a finding for factual insufficiency if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We employ the same standard of
review for an excessive damages complaint as for any factual sufficiency of the evidence complaint. Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex. 1998). 

 There are no objective guidelines available by which we may measure the money equivalent of pain, and the jury must be
allowed broad discretion in determining this amount. See Texarkana Mem. Hosp., Inc. v. Murdock, 946 S.W.2d 836, 841
(Tex. 1997). The mere fact that an award is large does not show that the jury was influenced by passion, prejudice,
sympathy, or other circumstances not in evidence, and the award must be flagrantly outrageous, extravagant, and so
excessive that it shocks the judicial conscience. Cresthaven Nursing Residence v. Freeman, 134 S.W.3d 214, 228 (Tex.
App.--Amarillo 2003, no pet.); see also Transit Mgmt. Co. of Laredo v. Sanchez, 886 S.W.2d 823, 826 (Tex. App.--San
Antonio 1994, no writ). An appellate court may not order a remittitur unless the evidence supporting damages is factually
insufficient. Torrington Co. v. Stutzman, 46 S.W.3d 829, 851 (Tex. 2000).











 Damages for Mrs. Peñalver's Pain and Mental Anguish

 The jury awarded the estate $500,000 for Mrs. Peñalver's pain and mental anguish. (4) Living Centers contends the evidence
is insufficient to support this award because Mrs. Peñalver was unconscious or comatose within approximately an hour and
forty-five minutes after the fall; she never regained consciousness; and she was medically incapable of consciously
experiencing pain after she became comatose. 

 There are no objective guidelines to assess the monetary equivalent of pain and suffering resulting from physical injury;
thus, the trier of fact is given considerable discretion in awarding amounts appropriate for such damages. See Southwest
Texas Coors, Inc. v. Morales, 948 S.W.2d 948, 951-52 (Tex. App.--San Antonio 1997, no writ). However, while juries
must be afforded discretion in arriving at the determination of a figure for which there is no exact evaluation, there must be
some evidence to justify the amount awarded, and juries cannot simply pick a number. Saenz v. Fidelity & Guar. Ins.
Underwriters, 925 S.W.2d 607, 614 (Tex. 1996).

 Mrs. Peñalver was injured at approximately 1:45 p.m. and there is no dispute that she eventually lapsed into a coma, from
which she did not recover. Thus, the issue is narrowed to whether the evidence supports the damage award for the pain and
anguish Mrs. Peñalver suffered during the short time before she became comatose. Only the pain and suffering that an
injured person consciously experienced are compensable; damages for any pain or suffering during the time the injured
person is unconscious are not permitted. See SunBridge Healthcare Corp. v. Penny, 160 S.W.3d 230, 248 (Tex.
App.--Texarkana 2005, no pet.); see also Russell v. Ramirez, 949 S.W.2d 480, 491-92 (Tex. App.--Houston [14th Dist.]
1997, no writ); Sharpe v. Munoz, 256 S.W.2d 890, 892 (Tex. Civ. App.--San Antonio 1953, writ ref'd n.r.e.). 

 On the day Mrs. Peñalver was dropped, Ramon's wife, Sofie Peñalver, was in the room with her. Sofie testified she told
Mrs. Peñalver she would brush her hair and clean her nails, and Mrs. Peñalver said "okay." Earlier in the day, while Mrs.
Peñalver was still in her bed, Sofie called Augustine to tell him the staff wanted to move Mrs. Peñalver from her bed to a
wheelchair. Upon hearing this, Augustine called the physical therapist to express his concerns about moving his mother. 
At some point in time, Mrs. Peñalver was moved from her bed to the wheelchair. Several hours later, at approximately 1:45
p.m. while being moved from the wheelchair back to her bed, Mrs. Peñalver was dropped on to a cement floor. After she
was dropped, Sofie held Mrs. Peñalver's head in her lap and she noticed Mrs. Peñalver's eyes were open and she was
moaning. When Sofie looked at her own hands, she saw blood. She later discovered Mrs. Peñalver had sustained a cut to
her ear from the fall. The paramedics' report indicated a one inch tear to her earlobe. 

 Ramon saw his mother after she was dropped, and before the ambulance arrived at the nursing home. He said that although
his mother was alert, she was moaning and in pain. Silver Creek staff members who assessed Mrs. Peñalver after her fall
also indicated she was alert, moaning, and in pain. A defense witness, Dr. Donald Richardson, characterized Mrs.
Peñalver's fall as "severe enough to cause subdural hematoma . . . [and] to give her multiple contusions [on her arm, leg,
and other areas] and [a cut to] her ear." Emergency room nurses who examined Mrs. Peñalver at approximately 3:35 p.m.
stated in their records that, "Patient withdraws to pain." The notes from the emergency room physician, who saw Mrs.
Peñalver at 4:05 p.m., described the severity of her pain as "moderate." Ramon saw his mother again at the nursing home
when she was returned by ambulance, and before her arrival was refused. Ramon said his mother looked "terrible." 

 Based on our review of the record, we conclude the evidence is legally and factually sufficient to support the damage award
to Mrs. Peñalver's estate and the award is not excessive.

 Damages for Augustine's and Ramon's Loss of Companionship and Society, and Mental Anguish



 The jury awarded Augustine and Ramon $250,000 each for loss of companionship and society and mental anguish
sustained in the past, and $50,000 each for loss of companionship and society and mental anguish to be sustained in the
future. Living Centers contends the evidence is insufficient to support the $250,000 award to Augustine because he knew,
even before the accident, that he would lose his mother; he had already done his grieving; and he sought counseling for
other issues in his life, in addition to the death of his mother. Living Centers asserts the evidence is insufficient to support
the $50,000 award to Augustine because he is a productive member of society, who stopped his grief counseling in
September 2001. As to Ramon, Living Centers contends the evidence is insufficient to support the $250,000 award to him
because plaintiffs failed to establish that Ramon's alleged mental anguish caused a substantial disruption in his daily routine
or caused a high degree of mental pain and distress. Living Centers contends the evidence is insufficient to support the
$50,000 award to Ramon because plaintiffs produced no evidence to establish that he would sustain any loss of
companionship and society and mental anguish in the future.

 Injuries to familial relationships are considered significant injuries worthy of compensation. Sanchez v. Schindler, 651
S.W.2d 249, 252 (Tex. 1983). Loss of companionship and society is described as a loss of the positive benefits that a
claimant would have received from a loved one such as love, comfort, and companionship. Moore v. Lillebo, 722 S.W.2d
683, 687-88 (Tex. 1986). On the other hand, mental anguish concerns compensation for the harrowing experience resulting
from the death of a loved one, i.e., what negative effects the death has had upon the claimant. Id.at 688. In awarding
damages for loss of companionship and society and for mental anguish, the jury may consider: (1) the relationship between
husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the
beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities. Id.

 It is clear from the evidence that Augustine and Ramon were always close to their mother, and remained so until her death. 
Although their careers obligated both sons to live away from San Antonio for periods of time, both ultimately moved back
to San Antonio permanently to be close to their mother. Augustine's and Ramon's father passed away in 1959, and their
mother never remarried. Sometime after their father's death, their mother moved in with Augustine. In 1997, Augustine and
Ramon made the difficult decision to move their mother to Silver Creek nursing home. Once at the nursing home, their
close relationship with their mother continued. 

 Either Augustine, Ramon, or Ramon's wife visited Mrs. Peñalver every day, often several times during the day, to socialize
with her, as well as to assist in her grooming, eating, and dressing. Many of the visits lasted for several hours. Often on
weekends, and always on holidays, either Augustine or Ramon took their mother out. Both men testified their mother
communicated with them, Ramon's wife and children, and the staff at Silver Creek, albeit with nods of her head, winks, and
a few words. Although the nursing home staff provided for Mrs. Peñalver, there were many days on which Augustine,
Ramon, or Ramon's wife provided all of her care, such as dressing, grooming, and feeding her. Augustine and Ramon
testified that, despite her advanced age and health issues, their mother enjoyed her life and her time with her family. She
watched television and read the newspapers, books, and the Bible. Ramon's wife often cooked for her. Mrs. Peñalver
received visits from her priest and the family often prayed with her.

 When Mrs. Peñalver was dropped and injured, both Augustine and Ramon went to the nursing home. When asked for the
worst memory of his life, Ramon responded, "When I walked into that room and she was moaning like that." Augustine
rode in the ambulance with his mother to the hospital, and he described how the ambulance went to one hospital first, but
was refused because its emergency room was closed, and then went to another hospital. He said, "And here we are running
around in an ambulance with my mom dying, and we can't find a hospital." After Mrs. Peñalver was discharged from the
hospital, she was taken back to the nursing home, which refused to accept her because of her condition. She was then taken
back to the hospital, where Augustine and Ramon discussed her condition and the decision whether to resuscitate her with
the doctors. Augustine described these discussions as the worst event in his life. 

 At trial, Living Centers portrayed Augustine as a productive member of society, who operates two commercial businesses,
is active in his community, and enjoys having friends. However, Augustine testified that the hardest part to deal with in his
mother's death is that she did not have a peaceful, comfortable death. Although he admitted to seeking counseling for other
issues in his life, he also sought counseling to deal with his grief. Ramon agreed that his mother did not die a peaceful or
comfortable death. He has not sought counseling and no longer thinks about her death on a daily basis. However, Ramon
has shared his grief with his wife, children, and Augustine. 

 This is not a case where adult children have abandoned an aging and infirm parent to the care of a nursing home. A review
of the full record reveals that Mrs. Peñalver was an integral part of her sons' daily lives until the very moment of her death. 
Either Augustine or Ramon saw her every day to socialize, pray, and assist in her daily needs. Although Mrs. Peñalver had
lived for almost ninety years at the time of her death, and each son had begun to prepare for their mother's eventual death
before September 2000, it is clear from this record that both men suffered mental anguish over the manner of their mother's
negligently-caused death and it is also clear that her death left a vacuum in this family. Thus, we conclude the evidence is
legally and factually sufficient to support the damage awards to Augustine and Ramon for past and future loss of
companionship and society and mental anguish, and hold the awards are not excessive.

Conclusion 

We overrule appellants' issues on appeal and affirm the trial court's judgment. Appellees assert, in a cross-issue, that
appellants' appeal is frivolous. Although we overrule all of appellants' issues on appeal, we conclude the appeal was
brought in good-faith; thus, we also overrule appellees' cross-issue.



 Phylis J. Speedlin, Justice

 

1. The jury found the following damages: Physical pain and mental anguish suffered by Maria Belia Peñalver - $500,000;
Funeral and burial expenses - $10,000; Augustine's past loss of companionship and society and past mental anguish -
$250,000; Augustine's future loss of companionship and society and future mental anguish - $50,000; Ramon's past loss of
companionship and society and past mental anguish - $250,000; and Ramon's future loss of companionship and society and
future mental anguish - $50,000. 

2. During trial, plaintiffs' counsel asked one of the experts, Dr. Bauserman, if he was familiar with the T-4 Project. Dr.
Bauserman replied that he was not, and the subject did not arise again until closing arguments. 

3. The jury heard testimony over a two-day period and deliberated for approximately three hours on three damages
questions. 

4. Living Centers does not challenge the sufficiency of the evidence to support the award for funeral and burial expenses.