LIVING CENTERS OF TEXAS, INC.,
Cyndi Brown, LNFA; and Kimberly
Bordovsky, DON, Appellants,

v.

Augustine PEÑALVER, Individually
and As Independent Executor of the
Estate of Maria Belia Peñalver, De-
ceased; and Ramon Peñalver, Appel-
lees.

No. 04–05–00565–CV.

Court of Appeals of Texas,
San Antonio.

Sept. 13, 2006.

Devon J. Singh, Brent R. Cooper, Diana L. Faust, Cooper & Scully, P.C., Dallas, for appellants.

George W. Mauze, II, Law Office of George W. Mauze II, P.C., San Antonio, for appellees.

Sitting: SARAH B. DUNCAN, Justice, PHYLIS J. SPEEDLIN, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion by PHYLIS J. SPEEDLIN, Justice.

This is an appeal from a judgment rendered on a jury verdict awarding survival and wrongful death damages to the estate of Maria Belia Peñalver and to her two sons, Augustine and Ramon Peñalver. Appellants' complaints fall into two categories: (1) jury argument; and (2) sufficiency of the evidence supporting the damage awards. We affirm.

### BACKGROUND

The underlying wrongful death and survival lawsuit was filed by the Independent Executor of Maria Belia Peñalver's estate and Peñalver's two sons, Augustine and Ramon (collectively, "the plaintiffs"). The case has been tried twice and is on its second appeal. The evidence, considered favorably to the verdict, shows that Mrs. Peñalver was admitted to Silver Creek Manor nursing home in 1997 because she needed twenty-four hour care and the family could no longer care for her. In September 2000, Christina Bartek, a certified nurse's aide, attempted, without assistance, to transfer Mrs. Peñalver from her wheelchair to her bed and dropped her. Mrs. Peñalver suffered injuries including a laceration to her earlobe, abrasions and contusions to the left side of her body, a subdural hematoma, and an intracerebral hemorrhage or bleeding in the brain. She died the next day. The medical examiner ruled the death accidental, caused by trauma from the fall.

Augustine and Ramon filed a wrongful death and survival suit against three defendants, Living Centers of Texas, Inc. d/b/a Silver Creek Nursing Home; Silver Creek's administrator, Cyndi Brown; and Silver Creek's director of nursing, Kim Bordovsky (collectively, "Living Centers" or "defendants"). The initial jury trial

resulted in a verdict in favor of the plaintiffs on their negligence claim, apportioning 50% of the fault to Living Centers, 25% to Brown, and 25% to Bordovsky. All parties appealed the judgment and this court reversed and remanded for a new trial. *See Peñalver v. Living Centers of Texas, Inc.,* No. 04-02-00920-CV, 2004 WL 1392268 at *1, *5 (Tex.App.-San Antonio June 23, 2004, no pet.).

Before the second trial on remand, Living Centers, Brown, and Bordovsky stipulated "to their joint and several liability for negligence proximately causing the death of Maria Belia Peñalver" and the case went to trial on the amount of compensatory damages. The trial court signed a judgment in accordance with the verdict [1], awarding the estate $510,000 and Augustine and Ramon each $300,000. In this appeal, Living Centers contends the plaintiffs' attorney made an improper and incurable jury argument that requires reversal; the damage awards are not supported by legally or factually sufficient evidence; and without regard to the sufficiency of the evidence, the damage awards are so excessive they clearly resulted from passion and prejudice. The plaintiffs have cross-appealed, contending the appeal is frivolous.

## JURY ARGUMENT

Living Centers asserts the trial court abused its discretion in denying defendants' motion for new trial on the ground that plaintiffs' counsel made an improper and incurable jury argument. The challenged closing argument referenced the T-4 Project of World War II as follows:

... But for some reason the defense is that this death is not significant because she is old and because she is impaired.

I disagree. Our society has not regressed to the point that we tolerate a wrongful death of anybody, of any age, or of any infirmity.

A factor in World War II—you heard me ask about—I asked Dr. Bauserman about the T—Four Project.[2] In World War II the Germans had a project called T-Four. You probably heard about it in history books.

But what they did is they took all the people who they thought were inferior in society, primarily older people, impaired people, and they used them for experiments. They killed them. Over 400,-000. That culture 60 years ago didn't consider the impaired and elderly valuable.

Our culture has never looked at that. We went to war to stop that, the biggest war in the history of the world to stop those atrocities that were going on. And we're not at the point where we're tolerant today, as the defense would like you to be, of this wrongful death.

The most significant gift we have from God is life itself. So shouldn't the damages for the loss of that significant life also be significant? The defense says our society says no. I think you folks disagree.

1. The jury found the following damages: Physical pain and mental anguish suffered by Maria Belia Peñalver—$500,000; Funeral and burial expenses—$10,000; Augustine's past loss of companionship and society and past mental anguish—$250,000; Augustine's future loss of companionship and society and future mental anguish—$50,000; Ramon's past loss of companionship and society and past mental anguish—$250,000; and Ramon's future loss of companionship and society and future mental anguish—$50,000.

2. During trial, plaintiffs' counsel asked one of the experts, Dr. Bauserman, if he was familiar with the T-4 Project. Dr. Bauserman replied that he was not, and the subject did not arise again until closing arguments.

. . .

It's the defense lawyers' job—and you've got—seen very fine lawyering by the defense lawyers. Fulbright and Jaworski, an excellent law firm, excellent lawyers. I respect their ability.

But their job here is to convince you that the damages are insignificant to minimize the damages. How have they done that? At the very beginning in opening statement [they] said they only have two defenses, if you want to call it defense. She is old and she is impaired.

That is not a defense to a wrongful death. Just like in the criminal justice system, if you murder someone, the fact they are young or old doesn't make a difference. It's a human being loved by God, loved by family, and protected by the laws of our society. Belia was protected by the laws of our society. And her death does make a significant difference to this family, and it should to our entire community.

. . .

So it really goes back to that, the initial issue, where are we as a society? Have we regressed to 1944, 1945 Germany? Have we regressed or gone ahead so far now, 60 years later now, we have a different attitude, that a wrongful death of an elderly or impaired person is not every bit as significant and has every bit as significant damages as the wrongful death of anyone else?

Living Centers maintains that the above-quoted argument compares "defendants, their treatments, and defense to the Nazi Germany's deplorable T–4 Euthanasia Program wherein the elderly and the infirm were calculatedly and brutally murdered." As such, Living Centers contends the argument is both an impermissible appeal to ethnic unity and an attack on the integrity of defense counsel. Living Centers asserts that because the argument is "extremely inflammatory and intentionally crafted by Plaintiffs' counsel to play on the jury's prejudices," it is incurable and necessarily harmful, requiring reversal of the trial court's judgment.

The plaintiffs defend the argument by characterizing it as a reference to history in response to Living Centers' "defense, throughout the trial, that Mrs. Peñalver was old and impaired, had no quality of life and no significant life expectancy and, therefore, fair and adequate compensation equated to an insignificant amount." The plaintiffs further maintain that Living Centers has "exaggerated" the argument; that plaintiffs' counsel never compared the defendants or their attorneys to Nazis; and that the words "Hitler," "Nazi," "brutally murdered" and "calculated murder" were never used by plaintiffs' counsel in closing argument. Finally, plaintiffs assert that, even if improper, the argument was curable, and Living Centers waived error by failing to object.

■■■ Trial counsel must confine their argument "strictly to the evidence and to the arguments of opposing counsel." Tex.R. Civ. P. 269(e). However, this does not mean that jury arguments must be sterile or nondescript; instead, counsel has great latitude in discussing the facts and issues. *Ramirez v. Acker*, 134 Tex. 647, 138 S.W.2d 1054, 1055 (1940); *Sanchez v. Espinoza*, 60 S.W.3d 392, 395 (Tex.App.-Amarillo 2001, pet. denied). For instance, counsel may discuss the "environments" or circumstances of the case, the reasonableness or unreasonableness of the evidence, and the probative effect (or lack thereof) of the evidence. *Ramirez*, 138 S.W.2d at 1055. Counsel's comments must be analyzed in light of the entire argument to determine their propriety. *Sanchez*, 60 S.W.3d at 396.

■ Generally, to obtain reversal on the basis of improper jury argument, an appellant must prove "(1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge." *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979). Further, unless the argument is of the incurable type, the appellant must also prove "that the argument by its nature, degree and extent constituted reversibly harmful error," and "that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Id.* at 839–40. The length of the argument, whether it was repeated or abandoned, and whether there was cumulative error are proper inquiries in this determination. *Id.* The appellate court must closely examine all of the evidence to determine the argument's probable effect on a material finding. *Id.* at 840. Finally, the appellate court must evaluate the jury argument in light of the entire case, beginning with voir dire and ending with closing argument. *Id.*

■ Here, because liability was stipulated during the second trial on remand, both plaintiffs and defendants focused solely on the issue of damages; a difficult issue as Mrs. Peñalver was already ninety years old at the time of her death. As defense counsel explained in closing, the jury had to determine "the value of the love, comfort and companionship that [Augustine and Ramon] would have gained from [Mrs. Peñalver] had she lived[.] So, of course, we have to consider how long she would have lived." Although our review of the entire record reveals no evidence that the staff of Silver Creek Nursing Home or defense counsel did not value human life, the defense clearly focused throughout trial on Mrs. Peñalver's age and her progressively deteriorating health, suggesting that her full and happy life was behind her. Thus, it is not surprising that plaintiffs responded on the issue of how to value a ninety-year-old-woman's remaining life before her negligently-caused death, and how to value the benefit her family would have derived from her continued presence in their lives and the loss of that presence. Nevertheless, the " 'great latitude' permitted counsel of both parties to indulge in 'flights of oratory' has its limits...." *Southwestern Greyhound Lines v. Dickson*, 149 Tex. 599, 236 S.W.2d 115, 119 (1951). For the purpose of this opinion, we assume without deciding that plaintiffs' counsel improperly exceeded the limit of tolerable jury argument.

■ However, it is undisputed that Living Centers did not object or ask for a curative instruction. Indeed, Living Centers had the opportunity to raise an objection outside the presence of the jury because the court took a brief recess shortly after the challenged argument. Living Centers chose not to raise an objection or request an instruction during trial, but waited to complain of the jury argument in its motion for new trial. *See Texas Emp. Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856, 858 (1954) ("... ordinarily a litigant will not be permitted to lie in wait, taking a chance on a favorable verdict and, being disappointed, complain of improper argument for the first time in a motion for new trial"). A complaint about improper, but curable, jury argument is waived by the failure to object at trial. *Standard Fire Ins.*, 584 S.W.2d at 841. Thus, the issue becomes whether Living Centers can sustain its burden to prove that plaintiffs' argument was incurable. *See Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex.

1968) (holding that if an "argument [is] so inflammatory that its harmfulness could not be eliminated by an instruction to the jury to disregard it," and "[t]he prejudicial nature of the argument is so acute that is 'incurable,' then" "the failure to object does not result in a waiver").

■■■■ "There are only rare instances of incurable harm from improper argument." *Standard Fire Ins.*, 584 S.W.2d at 839. The test for incurable error in jury argument is whether the argument, when viewed in light of the entire record, was so inflammatory as to strike at the heart of the adversarial process or appeal to fundamental prejudices. *Macias v. Ramos*, 917 S.W.2d 371, 375 (Tex.App.-San Antonio 1996, no writ). While we agree that "[t]he injection of new and inflammatory matters into the case through argument has in exceptional instances been regarded as incurable by an instruction," we disagree that this is such an "exceptional" case. *Standard Fire Ins.*, 584 S.W.2d at 840. Plaintiffs' counsel did not appeal to a racial or ethnic prejudice held by the jury, or attack defense counsel's integrity. *See Amelia's Auto., Inc. v. Rodriguez*, 921 S.W.2d 767, 773 (Tex.App.-San Antonio 1996, no writ) (argument's attack on integrity of opposing counsel was incurable error); *Texas Employers' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859, 866 (Tex.App.-San Antonio 1990, writ denied) (argument's appeal to jury's prejudice against party's ethnicity was incurable error).

■■■■ The dissent would say any reference to Hitler no matter how attenuated goes too far and constitutes incurable error and obviates the need for a proper objection. We disagree. Not every reference to an emotionally-charged time in history, even one as horrific as the T–4 Project, results in incurable error. Analogy is a tool that can be used during closing argument. *See Lone Star Ford, Inc. v. Carter*, 848 S.W.2d 850, 853 (Tex.App.-Houston [14th Dist.] 1993, no writ); *see also Fort Worth Hotel Co. v. Waggoman*, 126 S.W.2d 578, 587 (Tex.Civ.App.-Fort Worth 1939, writ dism'd) ("No objection can be successfully urged against an argument solely because of its oratorical appeal, forensic eloquence or metaphorical analogies, so long as they are applicable to facts and issues involved"). Also, in argument the facts of the case may be related to history, fiction, personal experience, anecdotes, Bible stories, or jokes. *See, e.g., Louisiana & Ark. Ry. Co. v. Mullins*, 326 S.W.2d 263, 267–68 (Tex.Civ.App.-Texarkana 1959, writ ref'd n.r.e.); *Sheffield v. Lewis*, 287 S.W.2d 531, 539 (Tex.Civ.App.-Texarkana 1956, no writ); *Winnsboro Cotton Oil Co. v. Carson*, 185 S.W. 1002, 1008 (Tex.Civ.App.-Dallas 1916, no writ); *Beaumont Traction Co. v. Dilworth*, 94 S.W. 352, 355 (Tex.Civ.App.–1906, no writ).

While we do not condone comparisons to Hitler, Nazis, or the programs adopted by the Nazis to eradicate whole segments of society, we believe it is significant that the issue before the jury was one of damages, not liability. Plaintiffs' counsel did not suggest that "the jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity." *See Texas Employers' Ins.*, 800 S.W.2d at 866. Plaintiffs' counsel did not compare defense counsel or any one of the defendants personally to the Nazis. Counsel did not compare the care offered by the nursing home to Nazi programs. Instead, we conclude that, when read in context, it is clear that plaintiffs' argument referenced an event during World War II in order to demonstrate that the life and death of an elderly and impaired person is considered significant in our society. Counsel clearly stated to the jury members, *"That culture 60 years ago didn't consider the impaired and elderly valuable. Our culture has*

*never looked at that. We went to war to stop that, the biggest war in the history of the world to stop those atrocities that were going on."*

Moreover, contrary to Living Center's argument that plaintiffs' counsel compared the defendants and defense counsel to Nazis, no such explicit comparison was ever made by plaintiffs' counsel. Instead, Living Centers is the party which, in its *own* closing argument, explicitly referred to "Nazis" four times, in an apparent attempt to counter the plaintiffs' argument:

> ... In 25 years of practicing law, I have never heard such a claim. I came before you at the very beginning of this case telling you that it was going to be an emotional issue. And, obviously, after what you just heard, that's correct.

> But *there are no Nazis in this courtroom*, and there are no babies. And there is an old, old rule of law that says, when the law is against you, practice character assassination. *And I've never been accused of being a Nazi before, but that's not what this case is about.*

> . . .

> *See, when you come down to your verdict, you don't get to think about things like Nazis, and babies, and the other lawyers, and whether they are good or bad, or anything like that.*

> You have to think about the facts of the case. And so I started out by telling you what I want to tell you now. We are here because obviously the parties have substantial disagreement about what fair and reasonable compensation is.

> But, obviously, the question is not the value of a life. Because the life in this case has been lived. It looks a lot like the first five minutes of Mr. Mauze's closing argument. It looks a lot like Plaintiffs' Exhibit 5. It sounds a lot like

the legacy that both of these fine gentlemen talked to you about.

> And that's good, and that's wonderful, and that's right, and it's lived and it's done, and they have got it, and they had it, and they knew it. And they also knew, ladies and gentlemen, that it was coming to an end. And so as hard as it is for all of us to deal with, we have to look at the facts.

> . . .

> *... And they would rather talk about Nazis and babies so that you don't get to the facts of the case.* And so, ladies and gentlemen we brought you what we had to bring to you. . . .

Not only did Living Centers not object to the plaintiffs' argument at trial, its own actions exacerbated any error. Living Centers took the plaintiffs' single reference to a relatively unknown event in history, *i.e.*, the T-4 experiments, and expanded it with multiple references to the universally known term "Nazi." Living Centers further transformed an indirect reference to a time period in history into an explicit reference to a racist group or view.

Viewed in the context of the entire record, we do not believe plaintiffs' closing argument, which referenced Germany's T-4 Project during World War II, constituted incurable error. Furthermore, Living Centers had the opportunity to object and request a curative instruction outside the jury's presence and failed to do so. *See Standard Fire Ins.*, 584 S.W.2d at 841; *c.f., Otis Elevator*, 436 S.W.2d at 333 (counsel not required to object in front of jury if doing so risks prejudicing one's cause with the jury); *General Motors Corp. v. Iracheta*, 161 S.W.3d 462, 472 (Tex.2005) (counsel not required to object in front of jury where to do so would risk

the jury's ire). Instead, Living Centers worsened any prejudice flowing from the argument by its own closing comments. *See Haywood,* 266 S.W.2d at 858. Accordingly, Living Centers' complaints regarding plaintiffs' jury argument are overruled.

### DAMAGES

Living Centers next asserts the damage awards are excessive and the result of prejudice and passion, thus entitling Living Centers to a new trial or, alternatively, a remittitur. Living Centers bases its contention that the damages are excessive on its argument that the jury's deliberations were brief[3] and plaintiffs' closing argument "invoked the jury's passion and prejudice to reach an award in favor of Plaintiffs to the extent that [the] incurable argument rendered the jury incapable of, or entirely unwilling, to consider the case on the merits." Living Centers also argues that the evidence is legally and factually insufficient to support the damage awards.

### *Standard of Review*

■ In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence that a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). Evidence is legally insufficient when there is a complete absence of evidence of a vital fact; the trial court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; the evidence offered to prove that fact is no more than a mere scintilla; or the evidence conclusively establishes the opposite. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706,

711 (Tex.1997). In reviewing the factual sufficiency of the evidence, we consider, weigh, and examine all the evidence presented at trial, including any evidence contrary to the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). We set aside a finding for factual insufficiency if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). We employ the same standard of review for an excessive damages complaint as for any factual sufficiency of the evidence complaint. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex. 1998).

■ There are no objective guidelines available by which we may measure the money equivalent of pain, and the jury must be allowed broad discretion in determining this amount. *See Texarkana Mem. Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1997). The mere fact that an award is large does not show that the jury was influenced by passion, prejudice, sympathy, or other circumstances not in evidence, and the award must be flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience. *Cresthaven Nursing Residence v. Freeman,* 134 S.W.3d 214, 228 (Tex.App.-Amarillo 2003, no pet.); *see also Transit Mgmt. Co. of Laredo v. Sanchez,* 886 S.W.2d 823, 826 (Tex.App.-San Antonio 1994, no writ). An appellate court may not order a remittitur unless the evidence supporting damages is factually insufficient. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 851 (Tex.2000).

### *Damages for Mrs. Peñalver's Pain and Mental Anguish*

■ The jury awarded the estate $500,000 for Mrs. Peñalver's pain and men-

---

**3.** The jury heard testimony over a two-day period and deliberated for approximately three hours on three damages questions.

No

tal anguish.[4] Living Centers contends the evidence is insufficient to support this award because Mrs. Peñalver was unconscious or comatose within approximately an hour and forty-five minutes after the fall; she never regained consciousness; and she was medically incapable of consciously experiencing pain after she became comatose.

There are no objective guidelines to assess the monetary equivalent of pain and suffering resulting from physical injury; thus, the trier of fact is given considerable discretion in awarding amounts appropriate for such damages. *See Southwest Texas Coors, Inc. v. Morales,* 948 S.W.2d 948, 951–52 (Tex.App.-San Antonio 1997, no writ). However, while juries must be afforded discretion in arriving at the determination of a figure for which there is no exact evaluation, there must be some evidence to justify the amount awarded, and juries cannot simply pick a number. *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996).

Mrs. Peñalver was injured at approximately 1:45 p.m. and there is no dispute that she eventually lapsed into a coma, from which she did not recover. Thus, the issue is narrowed to whether the evidence supports the damage award for the pain and anguish Mrs. Peñalver suffered during the short time before she became comatose. Only the pain and suffering that an injured person consciously experienced are compensable; damages for any pain or suffering during the time the injured person is unconscious are not permitted. *See SunBridge Healthcare Corp. v. Penny,* 160 S.W.3d 230, 248 (Tex. App.-Texarkana 2005, no pet.); *see also*

*Russell v. Ramirez,* 949 S.W.2d 480, 491–92 (Tex.App.-Houston [14th Dist.] 1997, no writ); *Sharpe v. Munoz,* 256 S.W.2d 890, 892 (Tex.Civ.App.-San Antonio 1953, writ ref'd n.r.e.).

On the day Mrs. Peñalver was dropped, Ramon's wife, Sofie Peñalver, was in the room with her. Sofie testified she told Mrs. Peñalver she would brush her hair and clean her nails, and Mrs. Peñalver said "okay." Earlier in the day, while Mrs. Peñalver was still in her bed, Sofie called Augustine to tell him the staff wanted to move Mrs. Peñalver from her bed to a wheelchair. Upon hearing this, Augustine called the physical therapist to express his concerns about moving his mother. At some point in time, Mrs. Peñalver was moved from her bed to the wheelchair. Several hours later, at approximately 1:45 p.m. while being moved from the wheelchair back to her bed, Mrs. Peñalver was dropped on to a cement floor. After she was dropped, Sofie held Mrs. Peñalver's head in her lap and she noticed Mrs. Peñalver's eyes were open and she was moaning. When Sofie looked at her own hands, she saw blood. She later discovered Mrs. Peñalver had sustained a cut to her ear from the fall. The paramedics' report indicated a one inch tear to her earlobe.

Ramon saw his mother after she was dropped, and before the ambulance arrived at the nursing home. He said that although his mother was alert, she was moaning and in pain. Silver Creek staff members who assessed Mrs. Peñalver after her fall also indicated she was alert, moaning, and in pain. A defense witness, Dr. Donald Richardson, characterized Mrs. Peñalver's fall as "severe enough to cause subdural hematoma ... [and] to give her multiple contusions [on her arm, leg, and

---

4. Living Centers does not challenge the sufficiency of the evidence to support the award

for funeral and burial expenses.

other areas] and [a cut to] her ear." Emergency room nurses who examined Mrs. Peñalver at approximately 3:35 p.m. stated in their records that, "Patient withdraws to pain." The notes from the emergency room physician, who saw Mrs. Peñalver at 4:05 p.m., described the severity of her pain as "moderate." Ramon saw his mother again at the nursing home when she was returned by ambulance, and before her arrival was refused. Ramon said his mother looked "terrible."

Based on our review of the record, we conclude the evidence is legally and factually sufficient to support the damage award to Mrs. Peñalver's estate and the award is not excessive.

### Damages for Augustine's and Ramon's Loss of Companionship and Society, and Mental Anguish

The jury awarded Augustine and Ramon $250,000 each for loss of companionship and society and mental anguish sustained in the past, and $50,000 each for loss of companionship and society and mental anguish to be sustained in the future. Living Centers contends the evidence is insufficient to support the $250,000 award to Augustine because he knew, even before the accident, that he would lose his mother; he had already done his grieving; and he sought counseling for other issues in his life, in addition to the death of his mother. Living Centers asserts the evidence is insufficient to support the $50,000 award to Augustine because he is a productive member of society, who stopped his grief counseling in September 2001. As to Ramon, Living Centers contends the evidence is insufficient to support the $250,000 award to him because plaintiffs failed to establish that Ramon's alleged mental anguish caused a substantial disruption in his daily routine or caused a high degree of mental pain and distress. Living Centers contends the evidence is insufficient to

support the $50,000 award to Ramon because plaintiffs produced no evidence to establish that he would sustain any loss of companionship and society and mental anguish in the future.

 Injuries to familial relationships are considered significant injuries worthy of compensation. *Sanchez v. Schindler*, 651 S.W.2d 249, 252 (Tex.1983). Loss of companionship and society is described as a loss of the positive benefits that a claimant would have received from a loved one such as love, comfort, and companionship. *Moore v. Lillebo*, 722 S.W.2d 683, 687–88 (Tex.1986). On the other hand, mental anguish concerns compensation for the harrowing experience resulting from the death of a loved one, *i.e.*, what negative effects the death has had upon the claimant. *Id.* at 688. In awarding damages for loss of companionship and society and for mental anguish, the jury may consider: (1) the relationship between husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities. *Id.*

 It is clear from the evidence that Augustine and Ramon were always close to their mother, and remained so until her death. Although their careers obligated both sons to live away from San Antonio for periods of time, both ultimately moved back to San Antonio permanently to be close to their mother. Augustine's and Ramon's father passed away in 1959, and their mother never remarried. Sometime after their father's death, their mother moved in with Augustine. In 1997, Augustine and Ramon made the difficult decision to move their mother to Silver Creek nursing home. Once at the nursing home, their close relationship with their mother continued.

Either Augustine, Ramon, or Ramon's wife visited Mrs. Peñalver every day, often several times during the day, to socialize with her, as well as to assist in her grooming, eating, and dressing. Many of the visits lasted for several hours. Often on weekends, and always on holidays, either Augustine or Ramon took their mother out. Both men testified their mother communicated with them, Ramon's wife and children, and the staff at Silver Creek, albeit with nods of her head, winks, and a few words. Although the nursing home staff provided for Mrs. Peñalver, there were many days on which Augustine, Ramon, or Ramon's wife provided all of her care, such as dressing, grooming, and feeding her. Augustine and Ramon testified that, despite her advanced age and health issues, their mother enjoyed her life and her time with her family. She watched television and read the newspapers, books, and the Bible. Ramon's wife often cooked for her. Mrs. Peñalver received visits from her priest and the family often prayed with her.

When Mrs. Peñalver was dropped and injured, both Augustine and Ramon went to the nursing home. When asked for the worst memory of his life, Ramon responded, "When I walked into that room and she was moaning like that." Augustine rode in the ambulance with his mother to the hospital, and he described how the ambulance went to one hospital first, but was refused because its emergency room was closed, and then went to another hospital. He said, "And here we are running around in an ambulance with my mom dying, and we can't find a hospital." After Mrs. Peñalver was discharged from the hospital, she was taken back to the nursing home, which refused to accept her because of her condition. She was then taken back to the hospital, where Augustine and Ramon discussed her condition and the decision whether to resuscitate her with the doc-

tors. Augustine described these discussions as the worst event in his life.

At trial, Living Centers portrayed Augustine as a productive member of society, who operates two commercial businesses, is active in his community, and enjoys having friends. However, Augustine testified that the hardest part to deal with in his mother's death is that she did not have a peaceful, comfortable death. Although he admitted to seeking counseling for other issues in his life, he also sought counseling to deal with his grief. Ramon agreed that his mother did not die a peaceful or comfortable death. He has not sought counseling and no longer thinks about her death on a daily basis. However, Ramon has shared his grief with his wife, children, and Augustine.

This is not a case where adult children have abandoned an aging and infirm parent to the care of a nursing home. A review of the full record reveals that Mrs. Peñalver was an integral part of her sons' daily lives until the very moment of her death. Either Augustine or Ramon saw her every day to socialize, pray, and assist in her daily needs. Although Mrs. Peñalver had lived for almost ninety years at the time of her death, and each son had begun to prepare for their mother's eventual death before September 2000, it is clear from this record that both men suffered mental anguish over the manner of their mother's negligently-caused death and it is also clear that her death left a vacuum in this family. Thus, we conclude the evidence is legally and factually sufficient to support the damage awards to Augustine and Ramon for past and future loss of companionship and society and mental anguish, and hold the awards are not excessive.

## CONCLUSION

We overrule appellants' issues on appeal and affirm the trial court's judgment. Ap-

pellees assert, in a cross-issue, that appellants' appeal is frivolous. Although we overrule all of appellants' issues on appeal, we conclude the appeal was brought in good-faith; thus, we also overrule appellees' cross-issue.

SARAH B. DUNCAN, Justice, dissenting.

Dissenting opinion by SARAH B. DUNCAN, Justice.

Ten years ago this Court adopted the test for incurable jury argument first enunciated by Chief Justice Ramey for the Tyler Court of Appeals in *Boone v. Panola County*, 880 S.W.2d 195, 198 (Tex.App.-Tyler 1994, no writ). *See Macias v. Ramos*, 917 S.W.2d 371, 375 (Tex.App.-San Antonio 1996, no writ). The test is two-pronged: "whether the argument, when viewed in light of the entire record was so inflammatory as to": (1) "strike at the heart of the adversarial process or" (2) "appeal to fundamental prejudices." *Id.* at 375. The second prong of the test was infused with practical significance in *Texas Employers' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859 (Tex.App.-San Antonio 1990, writ denied), in which this Court held that even a "veiled and subtle" appeal to ethnic prejudice is incurable error. *Id.* at 864-66. This case affords us a similar opportunity to breathe life into the first prong of this test by examining whether an argument "strike[s] at the heart of the adversarial process." The majority utterly fails to address this question and, in so doing, implicitly overrules this aspect of *Macias*. More importantly, by disingenuously assuming error and refusing to confront why the Peñalvers' T-4 argument was so very improper, indeed pernicious, in the context

of this case, the majority guts the incurable error doctrine for cases not involving pleas to racial or ethnic unity. Since 1979, when the Texas Supreme Court took such care to preserve the incurable error doctrine in *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835 (Tex.1979), the need for the doctrine—and the *Reese* Court's wisdom in preserving it—has perhaps nowhere been more forcefully demonstrated than in this appeal. I must therefore dissent.

### IMPROPER

By referencing the T-4 Program, the Peñalvers' attorney invoked the specter of not only the T-4 Euthanasia Program—"the official name of the Nazi Germany eugenics program" which "forcefully conducted mass sterilizations and killing of Germans who were institutionalized or suffering from birth defects"[1]—but also Hitler, "[p]erhaps the most universally hated character in the world today...."[2] The stated premise for referring to the T-4 Program was that "the defense is that this death is not significant because she is old and because she was impaired." But this stated premise represents an insidious mischaracterization of the defendants' argument. The defendants did not argue that Maria Peñalver's advanced age and substantial impairment rendered her *death* insignificant; to the contrary, the defendants argued that the brevity of her conscious pain and suffering, coupled with her advanced age and substantial impairment, limited the resulting *damages*.

The majority opinion suggests the T-4 argument was somehow rendered curable because it did not use the words "Hitler"

1. Wikipedia, *T-4 Euthanasia Program*, http://en.wikipedia.org/w/index.php?title=T-4_Euthanasia_Program & oldid=70794293 (as of Aug. 20, 2006).

2. *Winn v. Warner*, 172 S.W.2d 526, 528 (Tex. Civ.App.-San Antonio 1943, writ ref'd w.o.m.).

or "Nazi." But this holding "simply reward[s] counsel for ingenuity in packaging," as was so eloquently recognized in Justice Peeples's opinion in *Guerrero:*

> The law should not stoop to evaluating subtle distinctions such as whether an argument was too crude and revolting, or on the other hand sufficiently slick and artful to pass muster. To permit the sophisticated ethnic plea while condemning those that are open and unabashed would simply reward counsel for ingenuity in packaging. Inevitably, lawyers representing their clients zealously within the bounds of the law would test the limits and fine-tune their arguments to avoid being too explicit. Courts would be asked to label some arguments permissible and uphold them with a wink when everyone knew that an ethnic appeal had been made. That course would demean the law and perhaps deepen the divisions from which society already suffers.

*Guerrero,* 800 S.W.2d at 865. This case demonstrates the wisdom of *Guerrero's* holding. Only "with a wink" can it be argued that the jury in this case could not and did not connect the dots between the words the majority sanctions—"World War II," "the Germans," "atrocities," and the "T–4 Project."

The majority opinion also suggests the references to the T–4 Program demonstrate a permissible use of a rhetorical device generally permitted in closing argument—"analogy." But the analogy is a false one. This case involves one death resulting from stipulated negligence. The T–4 Program, on the other hand, involved more than 200,000 deaths resulting from nothing short of institutionalized murder. To even suggest that the facts in this medical negligence case warrant any mention of Hitler's program to experiment with and ultimately murder institutionalized and impaired individuals is not simply ludicrous; it is deeply offensive because it cheapens the horror of the T–4 Euthanasia Program and, most importantly in this context, constitutes error "calculated to arouse the deepest prejudice on the part of the jury." *Winn v. Warner,* 172 S.W.2d 526, 528 (Tex.Civ.App.-San Antonio 1943, writ ref'd w.o.m.). As Justice Murray so eloquently wrote in *Winn:* "To compare a litigant to this cruel, inhuman savage madman [Hitler], ... even though by the slightest remark, is calculated to arouse the deepest prejudice on the part of the jury and should not be done by counsel." *Id.*

The majority opinion also suggests the reference to Hitler's T–4 Program is a justified use of historical reference. But the reference is so plainly inapposite that it must be judged to have had no purpose other than to inflame the jury's passion. *See State v. Frink,* 158 N.C.App. 581, 582 S.E.2d 617, 624 (2003) ("Although our courts 'do not completely restrict closing arguments to matters that are only within the province of the record, to the exclusion of *any* historical references ... [we] will not allow such arguments designed to inflame the jury, either directly or indirectly, by making inappropriate comparisons or analogies' "; "using Hitler as the basis for the example has the inherent potential to inflame and to invoke passion in the jury.") (quoting *State v. Walters,* 357 N.C. 68, 588 S.E.2d 344, 366, *cert. denied,* 540 U.S. 971, 124 S.Ct. 442, 157 L.Ed.2d 320 (2003)), *appeal dism'd, rev. den.,* 358 N.C. 547, 599 S.E.2d 565 (2004).

There may come a civil case in which a reference to Hitler or the T–4 Program would be an appropriate use of analogy or historical reference and thus not constitute error. I shudder even to imagine such a case since it would necessarily involve the depraved experimentation on and murder

of impaired elders and innocent children. But a negligence case like this—in which a certified nurse's aide accidentally "dropped" an elderly resident—is clearly not such a case. I would therefore hold the reference to the T–4 Program was error and turn to whether it was curable by analyzing whether it struck at the heart of the adversarial system.

### INCURABILITY

Because the defendants stipulated to their negligence, the only jury argument available to them was the amount of the proximately-caused non-economic actual damages—the monetary value of the deceased's conscious physical pain and mental anguish and her sons' past and future mental anguish and loss of companionship and society. The defendants' arguments thus focused on certain undisputed facts that, they argued, limited the plaintiffs' damages: the deceased's conscious pain and suffering was brief (less than two hours); she was of advanced age (90) and therefore limited life expectancy; and she was, before the accident, substantially impaired (possible Alzheimer's and congophilic amyloid angiopathy or hardening of the brain vessels, which may have been the cause of severe or advanced senile dementia, all of which are terminal, progressive, and untreatable; being fed through a feeding tube and confined to a wheelchair; and existing in a mostly nonverbal state, communicating by nodding her head or with one or two words at a time).

In response to these arguments—necessarily rendered legitimate by a judicial system that requires placing a monetary value on the tragic loss of a human life—the Peñalvers' attorney invoked the specter of Hitler's T–4 Euthanasia Program. This is the name-calling pathos version of the straw man argument used so effectively by Senator Joe McCarthy when he pointed at people and called them Communists. By its very nature, this type of argument is designed to discourage a decision based upon rational thought and encourage a decision based upon emotion. As used here, this pathos argument deflected the jury's attention away from the factors involved in the legally-required loss valuation process to a highly-charged emotional question that was not before them— whether they or the defendants were like Hitler and his T–4 Euthanasia Program and thus did not properly value the life of an impaired elderly person. The argument obviously achieved its intended purpose: The $1.1 million in actual damages awarded by this jury are more than twice the $356,000 in actual damages found by the jury in the first trial. *See Peñalver v. Living Centers, Inc.*, No. 04–02–00920–CV, 2004 WL 1392268, at *1 (Tex.App.-San Antonio June 23, 2004, no pet.) (mem.op.). Indeed, the $1.1 million in actual damages awarded by this jury exceeds the combined total of the $356,000 in actual and $500,000 in exemplary damages found by the jury in the first trial. *See id.*

As the Texas Supreme Court has recognized, "basic to the very essence of the adversarial process . . . is that each party have the opportunity to adequately and vigorously present any material claims and defenses." *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex.2002) (quoting *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 437 (Tex.2000)). In this case, the defendants' right to present their material defenses to the claimed damages was met by the false and purely inflammatory analogy to the T–4 Program. I can envision no more direct hit to "the heart of the adversarial system." I would therefore hold the error was incurable.

### CONCLUSION

One of the few goods to have come out of World War II is the collective sense of

guilt we now feel for atrocities committed in other parts of the world. As Hans Rolfe said in his closing argument in Ernst Janning's trial in *Judgment at Nuremberg:* "Ernst Janning said he is guilty. If he is, Ernst Janning's guilt is the world's guilt— no more and no less."[3] This collective sense of guilt felt by so many since World War II carries with it at least the potential to cause us to feel a corresponding collective sense of responsibility and act to prevent the recurrence of anything approaching the horrors of the Nazi regime. To permit a lawyer to invoke that sense of guilt—to permit him to employ it to suggest to jurors that the defendant is no better than the perpetrators of the T–4 Program because it argues (as it has the legal right to do) that the damages are limited by the advanced age and substantial impairment of the victim and indeed that the jurors are no better if they do not award high damages—is wrong as a matter of law and public policy. To label such an inflammatory argument "curable" is, at best, "naive."[4] I therefore dissent.

3. AmericanRhetoric.com, Movie Speeches, *Judgment at Nuremberg,* http://www.american rhetoric.com/Movie Speeches/moviespeechjudgmentatnuremberg2.html (last visited Aug. 24, 2006).

4. *Bruton v. United States,* 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction.") (quoting *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring)); *see also Walker v. State,* 610 S.W.2d 481, 484 n. 6 (Tex.Crim.App. [Panel Op.] 1980) ("It is better to follow the rules than to try to undo what has been done. Otherwise stated, one cannot 'unring a bell'; 'after the thrust of the saber it is difficult to say forget the wound'; and finally 'if you throw a skunk into the jury box, you can't instruct the jury not to smell it.'") (quoting *Dunn v. United States,* 307 F.2d 883, 886 (5th Cir.1962)).